UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAULA SOUTHWORTH,

   Plaintiff,      Civil Action No. 2:12-cv-12243

  v.          District Judge Nancy G. Edmunds
            Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

   Defendant.
_____/

**REPORT AND RECOMMENDATION TO
DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [12] AND
GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [15]**

There is no question that Plaintiff Paula Southworth has faced more than her fair share of challenges. Her parents divorced when she was an infant. (Dkt. 7, Transcript ("Tr.") 461.) Plaintiff says her mother was an alcoholic and verbally and emotionally abusive. (Tr. 259, 461.) Plaintiff may also have been sexually abused. (Tr. 318.) Plaintiff started drinking alcohol and using marijuana around the age of 12. (Tr. 317.) This led to more serious substance abuse. (*Id.*) Then, in 2005, Plaintiff was diagnosed with bipolar disorder. (*See* Tr. 115, 452.) Medication for this disorder, along with marital problems, contributed to suicide attempts in 2007. (Tr. 254, 259, 403.) Plaintiff is presently the single mother of two young children. (Tr. 35.)

In 2008, Plaintiff applied for social security benefits alleging that she became disabled on January 1, 2007, when she was only 24 years old. (Tr. 115.) "Disability" is a legal question. *See* 42 U.S.C. § 423(d)(1). An Administrative Law Judge, acting on behalf of Defendant Commissioner of Social Security, reviewed the medical evidence, heard Plaintiff testify about her symptoms, and then

found that Plaintiff was not under a disability—as that term is used in the Social Security Act, 42 U.S.C. § 423(d)(1). This Court owes considerable deference to this conclusion. Upon review of Plaintiff's claims of error, the administrative record, and the ALJ's decision, the Court cannot say that the ALJ committed reversible error. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 12) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 15) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## I. BACKGROUND

### A. Procedural History

In June 2008, Plaintiff applied for period of disability and disability insurance benefits. (Tr. 13.) In November 2010, Plaintiff testified about her impairments before Administrative Law Judge Michael Hellman. (Tr. 28-54.) In a January 18, 2011 decision, ALJ Hellman found that Plaintiff was not disabled under the Social Security Act. (Tr. 13-23.) His decision became the final decision of the Commissioner of Social Security when the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff then filed this lawsuit. (Dkt. 1, Compl.)

### B. Medical Evidence

#### 1. Plaintiff's Mental-Health Treatment

Plaintiff managed her bipolar symptoms through therapy and medication. Plaintiff saw Alison Hartman, a social worker, for weekly therapy beginning in September 2005. (Tr. 452, 461.) Plaintiff's sessions focused on her troubled relationship with her husband, parenting, financial stressors, lack of family support and friends, alcohol use, and her relationship with her mother. (Tr. 452-626.) Over their many sessions, Hartman variously described Plaintiff's mood as "positive,"

"stable," "sad," "mildly depressed," "mildly to moderately depressed," and "depressed bordering on hopelessness." (*E.g.*, Tr. 478, 493, 500, 521, 531.) When Plaintiff was discharged from therapy in May 2008, however, Hartman noted that her symptoms had improved: "Paula has consistently maintained progress in setting better boundaries [and] in feeling more confident. She has grown a lot, likes her new job and is about to complete [the 'Love & Logic Group']." (Tr. 472.) From October 2008 to March 2009, Plaintiff had once-a-month counseling with Julie Deone. (Tr. 357-66.) Plaintiff then briefly attended group therapy. (Tr. 352-55.)

For medication management, Plaintiff primarily treated with Dr. Mukesh Lathia, a psychiatrist, Brenda Ruppal, a nurse in the same office as Dr. Lathia, and Donna Merrill, a physician assistant. Plaintiff also briefly received treatment from Marina Bogdanovich, a psychiatrist.

In January 2007, Plaintiff reported to Merrill that she was still experiencing depression but was not having rage outbursts. (Tr. 262.) Merrill continued Plaintiff on Zoloft but increased her dosage of Lamictal. (*Id.*) In February, Plaintiff reported that her moods were settling down, but she was still experiencing depression and mood exacerbations. (Tr. 261.)

In March 2007, Plaintiff was hospitalized for suicidal thoughts and a plan to overdose—in the prior two months, Plaintiff had made two such attempts, including swallowing "a bunch" of Zoloft. (Tr. 245, 269.) Plaintiff reported that she had not been sleeping and had been having marital problems, including a recent court-ordered separation. (Tr. 259; *see also* Tr. 252, 254.) Plaintiff told the attending physician, Dr. K. B. Kondapaneni, that Lamictal had increased her depression and caused her mood to swing more rapidly. (Tr. 245.) Upon evaluation, Dr. Kondapaneni noted that Plaintiff's concentration abilities, judgment, and insight were "poor." (Tr. 251.) Dr. Kondapaneni tapered Plaintiff from Lamictal, started Depakote, and admitted Plaintiff to the hospital's mental-

3

health unit. (*Id.*) Plaintiff was to follow-up with physician assistant Merrill or someone in her office. (*Id.*)

In June 2007, Plaintiff told Merrill that her depression, low motivation, and anxiety had continued. (Tr. 307.) Merrill planned to increase the Zoloft dosage. (*Id.*) At her periodic review with therapist Hartman, Plaintiff reported, "Sometimes I have really good days. Other days can be really bad; frustration, stress, crying, yelling." (Tr. 506.)

In July 2007, Plaintiff underwent a psychiatric evaluation with Dr. Bogdanovic. (Tr. 551-54.) Dr. Bogdanovic summarized Plaintiff's condition this way:

> Her current concerns are being very tired and fatigued, having a hard time getting up in the morning, and motivating herself to do things. She believes that it is medication induced. She does not believe that it is her mood and she does not think that she is actually depressed. She also reports that her mood has been more stable with less mood swings. She is not reporting any suicidal thoughts at this time. Her sleep is about eight hours per night. Appetite is stable. She spends time taking care of her children. She does some gardening. Her husband works. Their finances are tight and they don't have a steady babysitter, so she doesn't do much with her husband. She doesn't have any friends since she discontinued contact with her old friends that are all drug dealers. She doesn't have any family support and she is distant from both her mother and brother. She does have conflicts with mother in law.

(Tr. 552.) Dr. Bogdanovic modified Plaintiff's medications including increasing Effexor and decreasing Depakote. (Tr. 554.)

In August 2007, Plaintiff began working at a bowling alley as a cashier and a cook. (Tr. 35, 222.) At the end of that month, she told Dr. Bogdanovic that she had stopped taking Depakote because it made her tired. (Tr. 541.) Plaintiff had also run out of Effexor, which led to an increase in depression and a decrease in motivation. (*Id.*) Plaintiff, however, reported feeling happy about her job. (*Id.*) Dr. Bogdanovic restarted Plaintiff on Effexor. (*Id.*)

4

At her September 2007 periodic review with Hartman, Plaintiff told the therapist that she had been off her Depakote for five weeks and Effexor for three. (Tr. 505.) She described her condition in a contradictory manner: "My mindset is out of whack" and "I think I'm functioning very good." (Tr. 505.)

At her October 2007 appointment with Merrill, Plaintiff reported that Cymbalta, which the physician assistant had prescribed in September, helped her depression, anxiety, and anger outbursts. (Tr. 537.) Merrill noted, "She has had no episode[s] of manic activity. She is able to sleep at night. . . . [But] [s]he continues to have ongoing problems with depression and anxiety and anger outbursts. I would like to increase her Cymbalta [dosage]." (*Id.*)

In January 2008, Plaintiff began treating with Dr. Lathia. (Tr. 316, 488.) Plaintiff stated that her down moods would last two to three days; during this time, she would cry, feel helpless and guilty, and lacked ambition and energy. (Tr. 316.) Plaintiff explained that following a down spell, she would have a normal mood for two or three days, but then an up mood after that. (*Id.*) During her up mood, she would start projects without finishing them, have racing thoughts, and become easily distracted. (Tr. 316.) Plaintiff also informed Dr. Lathia about her family and substance abuse history. (Tr. 317.) Dr. Lathia performed a mental status exam; the results appeared normal except for anxiousness and mild dysphoria. (Tr. 318.) Dr. Lathia diagnosed bipolar disorder, alcohol and marijuana abuse in early remission, and cocaine and ecstacy abuse in full-sustained remission. (Tr. 318.)

In March 2008, Plaintiff told Dr. Lathia that while Wellbutrin and Depakote had initially helped, she had since become more depressed and irritable. (Tr. 323.) Dr. Lathia continued Plaintiff's medications. (*Id.*) Later that month, a nurse in Dr. Lathia's office increased Plaintiff's

5

Depakote dose. (Tr. 322.) At her periodic review with therapist Hartman, Plaintiff reported that her marital difficulties were making her "a little stronger" because she had to "stand up" for herself. (Tr. 465.)

When Plaintiff returned to Dr. Lathia in May 2008, he noted, "Last time I continued her on the same medications and now she is doing very well. She is doing good with her husband, who is now working at [a home and garden] store. She . . . is currently not working, but she is looking for a job." (Tr. 321.)

From June 2008 through February 2009, however, Plaintiff experienced an increase in her bipolar-related symptoms. In June, Plaintiff reported to a nurse in Dr. Lathia's office that despite sleeping only four hours per night, she was able to "go, go, go." (Tr. 320.) She said that she had depression at a seven on a ten-point scale along with manic episodes. (*Id.*) The nurse, on a physician's advice, increased Plaintiff's Depakote dosage. (*Id.*) In October 2008, Plaintiff told Dr. Lathia that she was still very depressed because of financial issues and possible home eviction. (Tr. 385.) Not only was Plaintiff unemployed, her husband was also finding only limited work as a painter. (*Id.*) Dr. Lathia modified Plaintiff's medications after Plaintiff reported that her medication caused tremors. (*Id.*) The next month, Plaintiff reported doing better after the medication change. (Tr. 381.) Dr. Lathia provided that Plaintiff's mood was "anxious" and her affect was "somewhat anxious, but better than before"; he noted that Plaintiff was "definitely less dysphoric." (*Id.*) But in December 2008, Plaintiff told nurse Ruppal that she had tried to overdose on one of her medications. (Tr. 380.) The reason for the attempt is unclear, but Ruppal noted that Plaintiff's depression had increased on Zypreza and that she was experiencing financial stressors. (*Id.*) In January 2009, Ruppal noted "huge stressors" but Plaintiff denied suicidal ideation. (Tr. 379.) The next month,

Plaintiff told Dr. Lathia that she was still feeling depressed, mainly because of financial problems. (Tr. 378.) Dr. Lathia again altered Plaintiff's medications. (Tr. 378.)

In April and May 2009, Plaintiff appeared to manage her bipolar symptoms. In April, she told Dr. Lathia that she was doing better. (Tr. 375.) Dr. Lathia noted that Plaintiff's "current [medication] combination [Wellbutrin, Tegretol, and Klonopin] appears to be working well." (*Id.*) In late May, Plaintiff reported that Abilify, which Dr. Lathia had started earlier that month, had given her a lot of energy. (Tr. 374.) Dr. Lathia observed that Plaintiff's affect was "significantly less anxious and dysphoric. She is smiling." (Tr. 374.)

This did not last. In July 2009, Plaintiff reported to Ruppal that her mind was always racing, and that she was only sleeping three to five hours per night. (Tr. 372.) Then, in early September 2009, Plaintiff similarly told Dr. Lathia that her mind had been racing and that she had been feeling both hyper and depressed. (Tr. 371.) Dr. Lathia noted, "She is no longer in [a] relationship with her husband. In fact, . . . she kicked him out." (*Id.*) Dr. Lathia modified Plaintiff's medications. (*Id.*)

By mid September 2009, Plaintiff was feeling "much better." (Tr. 370.) Plaintiff told Ruppal that she was "doing overall pretty good" and that she did not have any mood swings. (Tr. 370.)

With some setbacks, Plaintiff largely continued to manage her symptoms through the remainder of the period covered by the administrative record. In October 2009, Plaintiff told Dr. Lathia that she was doing better. (Tr. 369.) Dr. Lathia noted that her mood was "okay," that her affect was "less anxious and less dysphoric"; Plaintiff was "smiling." (Tr. 369.) Dr. Lathia continued Plaintiff's medication regimen of Tegretol, Wellbutrin, and Zyprexa. (*Id.*) In November 2009, Plaintiff told nurse Ruppal that she felt "blah" and still had racing thoughts. (Tr. 368.) Plaintiff rated her depression at a six and her anxiety at a four (both on ten-point scales). (*Id.*) Still, that month, Dr.

7

Lathia noted that Plaintiff was overall "doing good." (Tr. 367.) He provided that her mood was "okay" and affect was "somewhat anxious, but less dysphoric." (*Id.*) Dr. Lathia altered Plaintiff's medication because Plaintiff reported feeling tired. (*Id.*) In January and April 2010, Dr. Lathia again stated, "[t]he patient overall appears to be doing good." (Tr. 386, 394.) In June 2010: "patient was doing good. Her divorce is now finalized, which is good." (Tr. 403.) In July 2010, Ruppal provided "Moods stable!" (Tr. 402.) Plaintiff denied sleep issues, depression, mood swings, and anxiety. (*Id.*) She did, however, note that a particular medication made her feel "too sedated during the day"; Ruppal therefore decreased the dosage of that medication. (*Id.*) In September 2010, Plaintiff's symptoms increased. (Tr. 401.) She reported racing thoughts and felt like she was in a manic phase. (Tr. 401.) She told Ruppal that she had been sleeping only four hours per night and that her depression and anxiety were at a seven on a ten-point scale. (Tr. 401.) Ruppal altered Plaintiff's medications. (*Id.*) The next month, however, Dr. Lathia provided that Plaintiff was "doing okay" and described her mood as "okay" and her affect as "anxious and less dysphoric." (Tr. 446.) He noted, "She is smiling." (*Id.*)

No evidence from after October 2010 was provided to the ALJ prior to his January 2011 decision.[1]

_____

[1]The administrative record before the Court contains records submitted to the Appeals Council that primarily pertain to treatment after the ALJ's January 2011 decision. (Tr. 636-71.) Because the ALJ, whose decision is the final decision of the Commissioner, did not have a chance to review these records, the Court does not consider them in determining whether the ALJ erred. *See Davenport v. Comm'r of Soc. Sec.*, No. 10-13842, 2012 WL 414821, at *1 n.1 (Jan. 19, 2012) ("In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision . . . those 'AC' exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review." (citing *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993) and *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir.1996)), *report and recommendation adopted by* 2012 WL 401015 (E.D. Mich. Feb. 8, 2012).

### 2. Medical Opinions

In May 2009, Dr. Lathia completed a "Mental Impairment Questionnaire." (Tr. 344.) He noted that Plaintiff had "moderate improvement" in her bipolar symptoms but was unable to work due to the "severity of mood swings." (Tr. 346.) He further provided that Plaintiff had "marked" difficulties in social functioning, marked limitations in concentration, persistence, or pace, and "continual" episodes of decompensation, each of extended duration. (Tr. 347.) He also opined that Plaintiff had "marked" limitations in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 348.) Dr. Lathia added the following remarks, "Patient has extreme[] bi-polar disorder, ranging from manic to severe depression, leading to suicidal ideation and attempts result[ing] in psychiatric hospitalization. She is not capable of any gainful employment." (Tr. 349.)

The two experts who reviewed Plaintiff's medical file for the Social Security Administration made contrary findings. In July 2008, Ron Marshall, Ph.D., provided that Plaintiff had mild restrictions in activities of daily living, mild restrictions in social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 335.) Dr. Marshall also opined that Plaintiff retained the ability to do rote tasks, follow simple instructions, work with others, and even complete some complex, technical tasks. (Tr. 341.)

In April 2010, having reviewed Plaintiff's treatment record through January 2010, Dr. Ellen Rozenfeld, a psychologist, answered a series of interrogatories about Plaintiff's functioning. Similar to Dr. Marshall, she provided that Plaintiff had mild restrictions in activities of daily living and was moderately limited in social functioning and maintaining concentration, persistence, or pace. (Tr. 389.) Dr. Rozenfeld expanded on her concentration finding: "the claimant retains the mental

9

capacity to concentrate on, understand, and remember routine, repetitive instructions. Her ability to carry out tasks with adequate persistence and pace would be moderately impaired for complex [tasks,] but adequate for completion of routine, repetitive tasks." (Tr. 393.) Dr. Rozenfeld disagreed with Dr. Lathia: "The marked and extreme limitations opined by her treating psychiatrist do not appear supported by the underlying progress notes or the reported [activities of daily living]." (Tr. 393.)

### C. Testimony at the Hearing Before the ALJ

At her hearing before the ALJ, Plaintiff first discussed her cashier and cook job at the bowling alley. (*See* Tr. 35.) She explained that when she started at the bowling alley in August 2007, she worked 20 hours per week. (Tr. 36, 222.) But the alley later hired more full-time workers, and her hours decreased. (*Id.*) Plaintiff stated that she was not hired full time "[b]ecause I didn't think that I was able to do that." (*Id.*) It appears that Plaintiff ultimately had issues at the bowling alley, quit that job in March 2008, and started work at a gardening store later that month. (Tr. 36-37, 473, 475, 478, 481, 485.) Plaintiff testified that she was let go from that job after only a month because she was not "reliable enough." (Tr. 37.) Plaintiff explained that she made attempts to find other work, but did not follow through because she was afraid of being "let go again." (*Id.*)

When asked why she could not work, Plaintiff responded, "I don't have the energy for it." (Tr. 37.) She described feeling suicidal at times, crying a lot, and having "anger issues." (Tr. 38.) She further testified that she had racing thoughts that she struggled with on a daily basis. (Tr. 46.) Plaintiff also reported concentration problems: "I have a difficult time concentrating for long periods of time. I have trouble finishing projects that I start." (Tr. 47.) She later quantified that her concentration would "usually" be exhausted after "about five minutes." (Tr. 49.) Plaintiff said she

10

slept three to five hours per night, and then took "two or three hour naps." (*Id.*) Plaintiff testified that she had no friends that she spent time with. (Tr. 44.)

Plaintiff summarized her typical day this way:

> Usually get up around 6:00 a.m. I get my son up and ready for school. I usually walk him about a half a block to the bus stop and then I usually go home and take a nap until about 11:00 and then I get up for my daughter and take her to school at noon. And then when my son gets off the bus after school I go and get my daughter from school and then usually we'll get home, do homework. I'll make some dinner and pretty much laze around the rest of the day.

(Tr. 44.)

At the hearing, the ALJ also heard testimony from a vocational expert about job availability for someone with functional limitations approximating Plaintiff's. In particular, the ALJ asked about job availability for a hypothetical individual of Plaintiff's age (then 28), education (high school), and work experience who was capable of "simple[,] routine and repetitive tasks, with only simple decision making required," "respond[ing] appropriately to routine changes in the work setting," and "occasional interaction with the public, coworkers and supervisors." (Tr. 52.) The vocational expert testified that this hypothetical individual could perform work as a kitchen helper, janitor, and groundskeeper, each with over a hundred-thousand positions in the national economy. (Tr. 52.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

11

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.

> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Hellman found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of January 1, 2007. (Tr. 15.) At step two, he found that Plaintiff had the following severe impairments: "bipolar disorder, alcohol and marijuana abuse in early remission and cocaine and ecstasy abuse, in full sustained remission." (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed

impairment. (Tr. 16-17.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to

> perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to work involving simple, routine and repetitive tasks that require only simple decision making. The claimant can respond appropriately to routine changes in a work setting and only occasionally interact with the co-workers, supervisors and the public.

(Tr. 17.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 22.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 22-23.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from the alleged onset date through the date of his decision, January 18, 2011. (Tr. 23.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also

13

supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

Plaintiff explicitly identifies eight claims of error and implies a ninth. The wisdom of challenging an ALJ's decision in so many ways is debatable. *Cf. Fifth Third Mortgage Co. v. Chicago Title Ins. Co.*, 692 F.3d 507, 509 (6th Cir. 2012) ("When a party comes to us with nine grounds for reversing the district court, that usually means there are none."). Litigation strategy aside, the Court has carefully considered each claim. The Court begins with what appears to be Plaintiff's strongest argument: that the ALJ erred in assigning the opinion of her treating psychiatrist, Dr. Lathia, "little weight."

14

### A. The ALJ Reasonably Weighed the Opinion Evidence

Under the treating-source rule, the opinions of a claimant's treating physicians are generally given more weight than those of non-treating physicians because treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). In fact, if the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record," then an ALJ must give the opinion "controlling" weight. 20 C.F.R. §§ 404.1527(c)(2) 416.927(c)(2); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). And when an ALJ does not accord the treating physician's opinion controlling weight, he must remember that the opinion is still entitled to deference, and consider the non-exhaustive list of factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c) in determining how much weight to assign the opinion. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *accord Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). Additionally, the treating-source rule requires that an ALJ provide "good reasons" for the weight he assigns a treating-source opinion. *See e.g.*, *Wilson*, 378 F.3d at 544; *see also* S.S.R. 96-2p, 1996 WL 374188, at *4-5. This procedural right of explanation is substantial: abridgement typically warrants remand even if substantial evidence supports the ALJ's disability determination. *See Rogers*, 486 F.3d at 243; *Wilson*, 378 F.3d at 544.

Plaintiff casts her treating-source argument in a few different ways. She states, "there is ample evidence in the record that could be cited to support Dr. Lathia's finding's." (Pl.'s Mot.

15

Summ. J. at 8.) Similarly, she asserts that "the ALJ gave improper weight to . . . non-examining physician opinions," apparently referring to the ALJ's decision to give more weight to the opinions of Drs. Marshall and Rozenfeld than Dr. Lathia. (Pl.'s Mot. Summ. J. at 17 (capitalization altered).) She also claims that the "record as a whole clearly supports the findings of Dr. Lathia and Dr. Kondapaneni," the latter being the emergency-room physician who briefly treated Plaintiff in March 2007. (*Id.* at 15.) However framed, the essence of Plaintiff's treating-source argument is that the ALJ erred in failing to give controlling or great weight to Dr. Lathia's May 2009 opinion concluding, among other things, that Plaintiff had "extremely severe" bipolar that deprived her of the ability to do "any gainful employment." (*See id.* at 15-16; Tr. 349.)

There are good reasons for crediting Dr. Lathia's May 2009 opinion. *See* 20 C.F.R. § 404.1527(c)(2), (3); 20 C.F.R. § 416.927(c)(2), (3). By that time, Dr. Lathia, a specialist in psychiatry, had treated Plaintiff for about a year-and-a-half. (*See* Tr. 316, 344.) Plaintiff had already been in therapy for over three years. (*See* Tr. 344, 452, 461.) Dr. Lathia was also then aware that Plaintiff's bipolar symptoms required her medications to be very frequently altered. (*E.g.*, Tr. 320, 322, 323, 371, 378, 385, 401.) Also by May 2009, Plaintiff had attempted to commit suicide on more than one occasion. (Tr. 245, 269, 380.)

Still, the question is not whether substantial evidence supports crediting Dr. Lathia's opinion but whether substantial evidence supports the ALJ's conclusion to assign his opinion "little weight." Although the issue is close, the Court believes that the ALJ provided "good reasons" for discounting Dr. Lathia's opinion.

First, the ALJ believed that Dr. Lathia's own treatment records did not support his opinion. (Tr. 21; *see also* Tr. 20.) Plaintiff's treatment history prior to Dr. Lathia's May 2009 opinion

16

includes an eight-month period of heightened bipolar symptoms, surrounded by two periods of rather well-managed symptoms. Plaintiff began treating with Dr. Lathia in January 2008. At that time, as the ALJ pointed out, Plaintiff was working part-time at the bowling alley; she continued in this position into March 2008. (Tr. 35, 222, 323.) She then worked at a garden center for a month after that. (Tr. 36.) In May 2008, Dr. Lathia noted that Plaintiff was "doing very well." (Tr. 321.) From June 2008 through February 2009, however, Plaintiff's bipolar symptoms were more severe, peaking with a suicide attempt in December 2008. (Tr. 380.) Then Plaintiff's symptoms improved. In April 2009, Plaintiff reported doing well and Dr. Lathia noted that Plaintiff's medication appeared to be "working well." (Tr. 375.) In May 2009, albeit a couple weeks after he authored his May 2009 opinion, Dr. Lathia observed that Plaintiff's affect was "significantly less anxious and dysphoric. She is smiling." (Tr. 374-75.)

Plaintiff's mix of good and bad periods prior to May 2009—which is the only information upon which Dr. Lathia could have based his opinion—is not fully supportive, and arguably even contrary to, his May 2009 opinion. Dr. Lathia opined that Plaintiff had "continual" episodes of decompensation, each of extended duration. (Tr. 347.)[2] This finding is in tension with Dr. Lathia's

---

[2]The Social Security Listings define the phrase episodes of decompensation, each of extended duration as follows:

> Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a

statements that Plaintiff was, for significant periods, doing well; it is also inconsistent with Plaintiff's ability to work part time for a significant period. Dr. Lathia also provided that "even a minimal increase in mental demands or change in the environment would be predicted to cause the [patient] to decompensate." (Tr. 347.) The basis for this belief is also questionable. Plaintiff's lone hospitalization for a suicide attempt was in March 2007—well before Dr. Lathia began treating Plaintiff. Further, that attempt was medication induced and further triggered by serious marital problems. (Tr. 245, 252, 259.) It is true that Plaintiff attempted suicide once during Dr. Lathia's treatment; but during that time Plaintiff was faced with, in nurse Ruppal's words, "huge" stressors, including possible home eviction. (Tr. 379, 385.) In addition, like in March 2007, it appears that a medication change contributed to the December 2008 attempt. (Tr. 380.) These episodes of decompensation were not, as Dr. Lathia suggested, triggered by a "minimal increase in mental demands or change in the environment." (Tr. 347.) The ALJ therefore could have reasonably concluded that "Dr. Lathia's opinion concerning the claimant's ability to work is inconsistent with his documentation." (Tr. 21.)

Second, the ALJ discounted Dr. Lathia's opinion because he found more credible Dr.

---

halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00.C.4.

Marshall's July 2008 opinion and Dr. Rozenfeld's April 2010 opinion. (Tr. 20-21.) It is clear that both opinions are contrary to Dr. Lathia's. Dr. Marshall found that Plaintiff had mild restrictions in social functioning and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 335.) He also opined that Plaintiff retained the ability to do rote tasks, follow simple instructions, work with others, and complete some complex, technical tasks. (Tr. 341.) Dr. Rozenfeld similarly found that Plaintiff was moderately limited in social functioning and maintaining concentration, persistence, or pace and that she had the "mental capacity to concentrate on, understand, and remember routine, repetitive instructions." (Tr. 393.) In contrast, Dr. Lathia found that Plaintiff had marked limitations in social functioning and maintaining concentration, persistence, or pace and was not capable of "any" gainful employment. (Tr. 347, 349.)

The Court finds it was reasonable for the ALJ to have reconciled the conflicting opinions by assigning Dr. Marshall's opinion "some" weight and Dr. Rozenfeld's opinion "considerable" weight while assigning Dr. Lathia's opinion "little" weight. The Court recognizes that, as a general matter, an ALJ may not simply favor a file-review or consultative-examination opinion over a treating-source opinion. *See Hensley v. Astrue*, 573 F.3d 263, 266-67 (6th Cir. 2009) ("Nothing in the regulations indicates, or even suggests, that the administrative judge may decline to give the treating physician's medical opinion less than controlling weight simply because another physician has reached a contrary conclusion."). But here, the two state-agency opinions support one another. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). Further, Dr. Rozenfeld's opinion was based on another seven months of treatment records that were not available to Dr. Lathia at the time he authored his May 2009 opinion. *Cf.* S.S.R. 96-6p, 1996 WL 374180, at *3 ("[T]he opinion of a State

19

agency medical or psychological consultant or other program physician or psychologist may be entitled to greater weight than a treating source's medical opinion if the State agency medical or psychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source."). And between May 2009 and January 2010 (the most recent record available to Dr. Rozenfeld), Plaintiff's bipolar symptoms were largely manageable. In September 2009, Plaintiff was "doing overall pretty good" (Tr. 370); in October, Plaintiff's affect was "less anxious and less dysphoric" (Tr. 369); in November, Plaintiff reported racing thoughts, but that month Dr. Lathia noted that Plaintiff was overall "doing good" (Tr. 367); in January 2010, Dr. Lathia reported that "[t]he patient overall appears to be doing good" (Tr. 394). Dr. Rozenfeld, as evidenced by her detailed summary, considered this treatment history and Dr. Lathia's opinion. *See* 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources."). Also, Dr. Rozenfeld likely had more familiarity with the Agency's disability standards. *See* 20 C.F.R. § 404.1527(c)(6) ("[T]he amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the

weight to give to a medical opinion.").

In sum, Plaintiff has not shown that the ALJ erred in evaluating Dr. Lathia's May 2009 opinion. Dr. Rozenfeld had information before her that was not available to Dr. Lathia when he formed his opinion. Dr. Rozenfeld also provided much more reasoning for her findings. Her opinion is supported, instead of contradicted by Dr. Marshall's opinion. And, as discussed, certain of Dr. Lathia's findings were not supported by his own treatment notes. All of this together was a rational basis, articulated well enough, for the ALJ to have credited Dr. Rozenfeld's and Dr. Marshall's opinions over Dr. Lathia's. The Court, under its deferential review, will therefore not disturb the ALJ's weighing of the opinion evidence. *See Mullen*, 800 F.2d at 545 (the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

### B. Plaintiff's Other Claims of Error Based on Dr. Lathia's Opinion Do Not Warrant Reversal or Remand

Plaintiff raises at least three claims of error that are closely tied to her treating-source argument, and, therefore, fail to demonstrate reversible error for reasons closely tied to those just provided. Plaintiff says that the ALJ's hypothetical to the vocational expert was not an accurate portrayal of her functional limitations. (Pl.'s Mot. Summ. J. at 13-14.) In expanding on this argument, however, Plaintiff makes clear it is premised on Dr. Lathia's opinion: "the hypothetical grossly understates Plaintiff's limitations particularly if one is to accept as valid the assessments by her treating psychiatrist, Dr. Lathia." (*Id.* at 14.) Plaintiff also claims that substantial evidence does not support the ALJ's decision. (*Id.* at 15.) But this too is based on Dr. Lathia's opinion: "The record as a whole clearly supports the findings of Dr. Lathia and Dr. Kondapaneni in regard to the claimant. The ALJ's findings in regard to Plaintiffs restrictions are not supported by the entire record and in

21

fact rely almost wholly upon interpretations of the record performed by nontreating individuals who are not medical doctors." (*Id.* at 15.) Accordingly, the response to these arguments is this Court's determination that substantial evidence supports the ALJ's decision to credit the state-agency physicians' opinions over Dr. Lathia's.

Less reliant on Dr. Lathia's opinion is Plaintiff's claim that the ALJ erred by failing to credit her low Global Assessment Functioning ("GAF") scores of 41 to 50. (Pl.'s Mot. Summ. J. at 22-23.) When a physician assigns a GAF score of 41 to 50, she expresses her subjective belief that the patient has "[s]erious symptoms (e.g. suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV*"), 30-34 (4th ed., Text Revision 2000). Plaintiff says that the ALJ erred by failing to adequately account for the "serious" symptoms or impairments indicated by her scores.

The Court disagrees. First, Plaintiff's GAF scores were not all as low as she suggests. In particular, Plaintiff's GAF scores spanned the "serious" to "moderate"[3] categories: 50 (January 2007, Merrill), 55 (February 2007, Merrill), 40-45 (March 2007, Dr. Kondapaneni), 40 (June 2007, Merrill), 45 (August 2007, Dr. Bogdanovich), 50 (November 2007, Merrill), 40-45 (January 2008, Dr. Lathia), 50 (February 2009, therapist), 40-45 (May 2009, Dr. Lathia), and 55 (June 2009 therapist). (*See* Tr. 262, 261, 252, 307, 554, 537, 318, 353, 344, 353, respectively.)

Second, the ALJ could have reasonably discounted the lowest GAF scores. Dr. Lathia and Dr. Kondapaneni gave Plaintiff her lowest scores (40-45). But, as reasoned above, the ALJ

---

[3]A score of 51 to 60 corresponds to "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* at 34.

reasonably discounted Dr. Lathia's opinions. As for Dr. Kondapaneni, it is notable that he treated Plaintiff when she was at her worst: hospitalized for a possible suicide attempt spurred by medication side-effects and marital problems.

Third, GAF scores are not especially probative of a claimant's functioning. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("Because the final GAF rating always reflects the worse of [severity of symptoms and functional level], the score does not reflect the clinician's opinion of functional capacity." (internal quotation marks and citation omitted)); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place. . . . If other substantial evidence (such as the extent of the claimant's daily activities) supports the conclusion that she is not disabled, the court may not disturb the denial of benefits to a claimant whose GAF score is as low as Kornecky's [40-45, 46, 52, 50-55] or even lower."); *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006) ("[T]he Commissioner 'has declined to endorse the [Global Assessment Functioning] score for use in the Social Security and [Supplemental Security Income] disability programs, and has indicated that [Global Assessment Functioning] scores have no direct correlation to the severity requirements of the mental disorders listings.'" (quoting *Wind v. Barnhart*, No. 04-16371, 2005 WL 1317040, at *6 n.5 (11th Cir. June 2, 2005))).

Given that the ALJ had both factual and legal reasons for discounting Plaintiff's lowest GAF scores as an indicator of functioning, and given that Plaintiff had some "moderate" GAF scores, Plaintiff's speculation about the ALJ's insufficient consideration of her low scores does not demonstrate reversible error.

**C. The ALJ Did Not Reversibly Err in Assessing Plaintiff's Credibility**

An ALJ's credibility assessment proceeds in two steps. *Baranich v. Barnhart*, 128 F. App'x 481, 487 (6th Cir. 2005). First, the ALJ determines whether the claimant suffers from a "medically determinable impairment[] that could reasonably be expected to produce [the claimant's] symptoms." 20 C.F.R. § 404.1529(c)(1); *Baranich*, 128 F. App'x at 487. If so, the ALJ then evaluates the "intensity and persistence" of the claimant's symptoms. 20 C.F.R. § 404.1529(c)(1). At this second step, the ALJ should not reject a claimant's "statements about the intensity and persistence of [his] pain or other symptoms or about the effect [his] symptoms have on [his] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529(c)(2); *see also* S.S.R. 96-7p, 1996 WL 374186. To the contrary: 20 C.F.R. § 404.1529(c)(3) lists other considerations that should inform the ALJ's credibility assessment. Although an ALJ need not explicitly discuss every listed factor, *Cross v. Comm'r of Soc. Sec.,* 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005), an ALJ's "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight," S.S.R. 96-7p, 1996 WL 374186 at *2.

When an ALJ applies the above framework, a court is to accord his credibility determination "great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *see also Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 488 (6th Cir. 2005) ("Claimants challenging the ALJ's credibility findings face an uphill battle."). Further, an ALJ's

24

credibility analysis is subject to harmless error review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) (citing *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1162 (9th Cir. 2008) with approval); *Carmickle*, 533 F.3d at 1162 ("So long as there remains substantial evidence supporting the ALJ's conclusions on credibility and the error does not negate the validity of the ALJ's ultimate credibility conclusion, such is deemed harmless and does not warrant reversal." (quotation marks omitted and punctuation altered)).

Plaintiff contends that the ALJ erred in discounting certain aspects of her testimony. (Pl.'s Mot. Summ. J. at 4, 6, 8, 18-21.) Plaintiff identifies statements about her energy to work, suicidal feelings, crying spells, anger, racing thoughts, limited concentration, insomnia, anxiety, and rarely leaving her home. (*Id.* at 4.) Plaintiff believes that the record supports her testimony about these bipolar-related symptoms and the ALJ therefore erred in not fully crediting them. (*Id.* at 21.)

Regarding some of the cited testimony, Plaintiff has not explained how it affects the ALJ's residual *functional* capacity assessment. For example, Plaintiff testified, "I feel suicidal at times, I cry a lot. I have some anger issues because of [my depression], also." (Tr. 38.) But this is a recitation of symptoms, not functional limitations. Restated, it is not apparent how suicidal thoughts, crying, and anger affect a particular work-related task. Indeed, in testifying about her anger, Plaintiff admitted that she never had any issues with coworkers or supervisors. (Tr. 49.) The same can be said about Plaintiff rarely leaving her home: that she did not participate with her children in activities outside the home (Tr. 43) does not readily translate into social problems in a work setting.

It is true, however, that some of the testimony that Plaintiff claims the ALJ wrongly discredited described her ability to function in a work setting. Plaintiff stated that her racing thoughts and anxiety affected her ability to concentrate. (Tr. 45-46, 50.) She quantified this problem by

25

providing that she could "usually" concentrate for only "about five minutes." (Tr. 49.) Regarding her difficulty sleeping, Plaintiff stated that she would typically sleep three to five hours at night and then take two to three hour naps. (Tr. 47.) When asked how that would affect her ability to work, Plaintiff stated, "I think I'd be late." (Tr. 48.)

Before turning to the ALJ's reasons for discounting this testimony, it is important to acknowledge that the ALJ's residual functional capacity assessment includes significant functional limitations intended to capture the effect of Plaintiff's bipolar symptoms on her ability to work. In particular, they limited Plaintiff to a job involving only "simple, routine and repetitive tasks," "simple decision making," "routine changes in a work setting," and occasional (less than one-third of a workday) interaction with "co-workers, supervisors and the public." (Tr. 17.) Thus, to demonstrate reversible error, Plaintiff has the burden of showing that an ALJ who agreed that her bipolar symptoms justified significant limitations, lacked a substantial basis for not fully crediting her testimony of more significant limitations.

Plaintiff has not carried her burden. First, the ALJ pointed out that Plaintiff was capable of a significant number of daily activities that call into doubt her ability to concentrate for only five minutes. (Tr. 16.) This was reasonable: Plaintiff testified that she is able to take care of her basic needs, complete chores around the house, go grocery shopping, and, perhaps most significantly, take care of her children, including driving her daughter to school, making simple meals, and ensuring that her children do their homework. (Tr. 41-44.) The ALJ also noted that Plaintiff's ability to work part-time, including after her alleged disability onset date, undermined her testimony of severe mental limitations. (Tr. 21-22.) This too was reasonable. Well after her bipolar diagnosis in 2005, Plaintiff worked part-time for eight months at a bowling alley; about three of those months were

after the alleged onset date. Third, as discussed, the ALJ reasonably credited the opinions of Drs. Marshall and Rozenfeld. Both believed that Plaintiff could perform the type of work specified by the ALJ in the residual functional capacity assessment. (*Compare* Tr. 17, *with* Tr. 341, 393.) Indeed, Dr. Marshall specifically found that Plaintiff had full ability to understand, remember, and carry out simple instructions and was only moderately limited in her ability to maintain regular attendance and be punctual within customary tolerances. (Tr. 339.) Together, all of this is substantial evidence supporting the ALJ's determination not to credit Plaintiff's testimony beyond the limitations set forth in the residual functional capacity assessment. As such, the Court may not disturb the ALJ's credibility assessment. *See Jones*, 336 F.3d at 476; *Daniels*, 152 F. App'x at 488.

### D. The ALJ's Residual Functional Capacity Assessment Accurately Portrays What She Can Still Do Despite Her Concentration Problems

At step three of the five-step disability analysis, the ALJ concluded that Plaintiff had "moderate" limitations in maintaining concentration, persistence, or pace ("CPP") (Tr. 16), i.e., that Plaintiff was moderately limited in her "ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings," 20 C.F.R. pt. 404, subpt. P, app'x 1, § 12.00(C)(3). But, when formulating a residual functional capacity assessment and corresponding hypothetical for the vocational expert, the ALJ did not include CPP-specific limitations (e.g., "no fast-paced production work"). (Tr. 17.) Plaintiff says that this omission constitutes reversible error. (Pl.'s Mot. Summ. J. at 11-12.)

This Court has addressed this argument several times before. *E.g.*, *Lamb v. Comm'r of Soc. Sec.*, No. 10-14645, 2011 U.S. Dist. LEXIS 153641, at *39-59 (E.D. Mich. Dec. 1, 2011) (Michelson, M.J.), *report and recommendation adopted*, 2012 U.S. Dist. LEXIS 25222 (E.D. Mich. Feb. 28, 2012) (Duggan, J.). *White v. Comm'r of Soc. Sec.* is this Court's most recent attempt to

reconcile the precedents. No. 12-12833, slip report and recommendation (E.D. Mich. Apr. 26, 2013)

(Michelson, M.J.).[4] This Court's summary in that case is helpful here:

> In sum, some cases seem to suggest that it is almost always inconsistent for an ALJ to find that a claimant has "moderate" limitations in CPP while, at the same time, excluding CPP-specific language in the residual functional capacity assessment. *See, e.g.*, [*Allen v. Comm'r of Soc. Sec.*, No. 09-13503, 2010 WL 3905983 at *5-6 (E.D. Mich. June 2, 2010), *report and recommendation adopted*, 2010 WL 3905194 (E.D. Mich. Sept. 30, 2010)]; [*Brown v. Comm'r of Soc. Sec.*, 672 F. Supp. 2d 794, 797 (E.D. Mich. 2009)]; [*Green v. Comm'r of Soc. Sec.*, No. 08-11398, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009)]. The underlying reasoning, apparently, is that claimants with "moderate" CPP limitations typically have difficulty staying on task or keeping pace even when performing "unskilled" or "simple, routine" work. Other decisions have recognized that limiting a claimant to "unskilled" work or "simple, routine" tasks may be sufficient to account for the claimant's "moderate" limitations in CPP because at least some claimants with those limitations can stay on task and keep pace when the work is simple. *See* [*Sutherlin v. Comm'r of Soc. Sec.*, No. 10-10540, 2011 WL 500212, at *2-3 (E.D. Mich. Feb. 8, 2011)]; [*Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010)]; [*Hess v. Comm'r of Soc. Sec.*, No. 07-13138, 2008 WL 2478325, at *7-8 (E.D. Mich. June 16, 2008)]. In support of this theory are medical evaluations that rate a claimant's CPP limitations as moderate while nonetheless concluding that the claimant can perform unskilled work on a sustained basis.
>
> Given the absence of a uniform, categorical rule, ALJs would greatly aid reviewing courts if they would explain why they are assigning claimants a "moderate" limitation in CPP, and—more importantly— why the mental-capacity limitations (e.g., "unskilled" work) in the residual functional capacity assessment and corresponding hypothetical fully account for that moderate rating.

*White*, No. 12-12833, slip report and recommendation at 25.

Like *Allen*, *Brown*, and *Green*, at step three of the five-step disability analysis, ALJ Hellman,

---

[4]Objections to this Court's report and recommendation in *White* are pending.

based on his own review of the record, concluded that Plaintiff had "moderate" difficulties in concentration, persistence, or pace. (Tr. 16.) Without more, this would suggest that remand is necessary for the ALJ to resolve the apparent inconsistency between this finding and a residual functional capacity assessment that does not include CPP-specific language.

But there is more. At the end of his step-three analysis, the ALJ made clear that he intended his residual functional capacity assessment to fully account for his "moderate" CPP finding at step three:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(Tr. 17.) Restated, the ALJ believed that his "moderate" CPP rating was fully accounted for by the limitations in his residual functional capacity assessment, e.g., "simple, routine and repetitive tasks that require only simple decision making."

Plaintiff's claim-of-error therefore reduces to whether substantial evidence supports the ALJ's belief that, despite her "moderate" problems in CPP, Plaintiff could still perform simple, routine, repetitive tasks on a sustained basis. As discussed, the ALJ reasonably found that Plaintiff's activities of daily living were, on the one hand, inconsistent with her testimony that she could concentrate for only five minutes, but, on the other hand, consistent with the ability to perform simple tasks on a sustained basis. Also as discussed, the ALJ reasonably credited Dr. Marshall's and

29

Dr. Rozenfeld's opinions over Dr. Lathia's. Both state-agency physicians found that Plaintiff had "moderate" problems in CPP. Despite this, both physicians found that Plaintiff could perform tasks akin to those permitted by the ALJ's residual functional capacity assessment. (*See* Tr. 341, 393.) In this way, this case is more like *Sutherlin*, *Lewicki*, and *Hess* than *Allen*, *Brown*, and *Green*. Further, Plaintiff's principal case is distinguishable: *Edwards v. Barnhart*, 383 F. Supp. 2d 920 (E.D. Mich. 2005) did not consider the import of a physician rating the claimant's concentration problems as "moderate" while simultaneously concluding that the claimant could perform unskilled or simple work on a sustained basis. *See id.* at 928-31.

In short, Plaintiff has not demonstrated that remand is necessary for the ALJ to add CPP-specific limitations to his residual functional capacity assessment and corresponding hypothetical to the vocational expert.[5]

### E. Plaintiff Has Not Shown That the ALJ Failed to Incorporate Her Severe Impairments Into the Residual Functional Capacity Assessment

Finally, Plaintiff claims that the ALJ failed to incorporate her severe impairments into his residual functional capacity assessment. (Pl.'s Mot. for Summ. J. at 21-22.) Apparently, however, this argument was "borrowed" from another brief. Plaintiff claims that "[o]ne, two and three step tasks are work skills, not mental abilities." (*Id.* at 21.) But the ALJ in this case, while using comparable language, did not use the phrase "one, two, and three step tasks" to describe Plaintiff's

---

[5]Although not explicitly identified as a claim of error, Plaintiff, in summarizing the ALJ's findings, appears to assert that the ALJ erred at step three by concluding that she had only "moderate" limitations in social functioning and only "moderate" limitations in concentration, persistence, or pace. (*See* Pl.'s Mot. Summ. J. at 2-3.) Plaintiff, however, simply attacks the ALJ's rationales without identifying any evidence that she has "marked" limitations in either of these two "B" criteria. (*See id.*) To the extent that Plaintiff relies on her testimony or Dr. Lathia's opinion, this argument fails for reasons discussed.

functional ability.

In any event, this argument is too undeveloped to pursue further. Plaintiff cites law, but does not apply it to this case. (*See id.* at 21-22.) This claim of error is thus forfeited. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) ("[I]ssues which are adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks and citation omitted)); *Baldwin v. Astrue*, No. 08–395, 2009 WL 4571850, at *3 (E.D. Ky. Dec.1, 2009) ("The Plaintiff is represented by counsel, and the Court is not required to formulate arguments on the Plaintiff's behalf.").

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 12) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 15) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case

31

Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  June 11, 2013


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 11, 2013.


s/Jane Johnson
Deputy Clerk